IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MARYLIN TALAVERA-IBARRONDO,
ESPERANZA ROSA-JIMENEZ,

    **Plaintiffs,**

       **v.**

MUNICIPALITY OF SAN SEBASTIAN,
*et al.*,

    **Defendants.**

**Civil No.** 09-1942 (FAB)

### OPINION AND ORDER

BESOSA, District Judge.

On September 30, 2011, a jury rendered its verdict in favor of plaintiffs Marilyn Talavera-Ibarrondo ("Talavera") and Esperanza Rosa-Jimenez ("Rosa") against defendant Municipality of San Sebastian ("the Municipality") for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, and P.R. Laws Ann. tit. 29, §§ 155 ("Law 17") and 1321 ("Law 69"). Before the Court are two post-trial motions filed by the parties. First, plaintiffs Talavera and Rosa filed an unopposed motion to amend judgment on October 1, 2011. (Docket No. 148.) Second, the Municipality filed a motion for judgment as a matter of law, a motion for a new trial, and a motion to amend the judgment, on October 24, 2011. (Docket No. 159.) Plaintiffs filed an opposition to defendant's motion on November 15, 2011. (Docket No. 162.)

## I.   Judgment as a Matter of Law pursuant to Rule 50

Defendant Municipality has moved for judgment as a matter of law on the grounds that plaintiffs failed to proffer evidence to support the grant of compensatory damages in the amount of $1.6 million and punitive damages in the mount of $2 million.  (Docket No. 159 at 5-6.)  Defendant challenges the jury's findings of a hostile work environment and retaliation in favor of plaintiffs Rosa and Talavera.

### A.   Legal Standard under Rule 50

A court may grant judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed.R.Civ.P. 50(a)(1).  "The standard for granting a Rule 50 motion is stringent." Malone v. Lockheed Martin Corp., 610 F.3d 16, 20 (1st Cir. 2010).  When a party files a motion under Rule 50, the "motion must specify the judgment sought and the law and facts that entitle the movant to the judgment."  "[T]he court should review all of the evidence in the record.  In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it **may not make credibility determinations or weigh the evidence**." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (emphasis added).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences

from the facts are jury functions, not those of a judge." Id. at 150-52, (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).   Evidence supporting a verdict may be entirely circumstantial and it need not exclude every hypothesis contrary to the verdict; "that is, the fact-finder may decide among reasonable interpretations of the evidence." Id.   A court may only grant judgment as a matter of law when "the evidence, together with all reasonable inferences in favor of the verdict, could lead a reasonable person to only one conclusion, namely that the moving party was entitled to judgment." Marrero v. Goya of P.R., Inc., 304 F.3d 7, 22 (1st Cir. 2002) (quoting Lama v. Borras, 16 F.3d 473, 477 (1st Cir. 1994)).

**B.   Hostile Work Environment under Title VII**

Title VII provides protection to employees against situations where "sexual harassment is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998) (citations, internal quotation marks and brackets omitted); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986). To prevail in a hostile work environment claim, the plaintiff must prove the following six elements:

1.   that she . . . is a member of a protected class;

Civil No. 09-1942 (FAB)                                                    4

    2.   that  she  was  subjected  to  unwelcome  sexual harassment;

    3.   that the harassment was based upon sex;

    4.   that  the  harassment  was  sufficiently  severe  or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment;

    5.   that  sexually  objectionable  conduct  was  both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and

    6.   that  some  basis  for  employer  liability  has  been established.

O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001). The first five elements are composed of five overlapping questions that, taken together, are designed to prove that the plaintiff was subjected  to  a  hostile  work  environment.  The  last  element  is designed to prove that there is a basis for employer liability.

    **i.   Hostile Work Environment**

      There is no specific test used to determine whether a plaintiff has been subjected to a severe or pervasive hostile work environment; rather, a court must examine the totality of the circumstances.  Faragher, 524 U.S at 787.  The factors to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work performance." Marrero v. Goya de P.R., Inc., 304 F.3d 7, 18-19 (1st Cir. 2002) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  Evidence of sexual remarks and innuendos, ridicule and intimidation, and disgusting comments can constitute a hostile work environment.  See id. at 19.  Similarly, uninvited sexual advances or requests for sexual favors can comprise a hostile work environment.  Gorski v. New Hampshire Dep't. of Corrections, 290 F.3d 466, 472 (1st Cir. 2002).

        The Municipality claims that plaintiffs failed to present evidence to show that Randy Rodriguez's behavior rose to the level of creating a hostile work environment.  (Docket No. 159 at 23-24.)   Plaintiffs counter by claiming that they presented sufficient evidence in support of the allegation that they were subjected to a hostile working environment, and that defendant Municipality admitted, through an adoptive admission of an administrative ruling it itself requested, that both plaintiffs were sexually harassed.

        The Court will briefly review the evidence presented at trial in support of the allegation that plaintiffs were subjected to a hostile working environment.  Plaintiff Talavera testified as to the following:  (1) when she was hired as a promoter for the "Puerto Rico en Forma" program, Randy Rodriguez stated that he was glad the mayor sent him "a young and good

looking girl, because the other former promoter was fat, ugly and very dumb"; (2) during the first month of employment, Rodriguez often used "foul language within the office" including words like "sucker", "son of a bitch", "get screwed"; (3) during the first month of employment, Rodriguez would frequently make humiliating comments about plaintiff Rosa's body in front of other people; (4) Rodriguez would often engage in "farting contests", spit, "pull[] out snot balls out of his nose" and place it on the desks; (5) Rodriguez made comments about women and sexual relationships in the workplace such as "I turned her inside out like if she were a sock", "women are only worth for washing, cleaning, picking things up, [and] having sex". (Docket No. 162-1 at 52, 55-60.) Plaintiff Talavera also testified that Rodriguez would ask her "what type of sexual positions [she] enjoyed"; would show her photographs taken on his cell phone of naked men and women in compromising sexual positions; and make comments such as "that's how you like it, right?" and "see, this one's a horny one". (Docket No. 162-1 at 61-62.)

Plaintiff Rosa testified as to many of the same facts as plaintiff Talavera. (Docket No. 162-2 at 61-72.) Specifically, she testified that Rodriguez would often "talk in a vulgar and a very loathsome manner"; he would "spend time farting in the office area"; he would "pull out mucous stuff, the tissue up his nose, and then pull it out and put it over the desk"; and "he'd

say his ass would itch." Id. at 61-62.  Plaintiff Rosa also testified that Rodriguez made comments regarding her physical appearance, that she "had a whole bunch of tits that Rin Tin Tin couldn't jump over them . . . that [she] was flat-assed." Id. at 62.  When plaintiff Rosa was given her paycheck, she testified that Rodriguez would tell her "here's your check so you could pay your husband so he could sleep with you because that's the only way he would do so because you're old, ugly, flat-assed and titty." Id. at 63.  Plaintiff Rosa echoed plaintiff Talavera's testimony in recounting that Rodriguez had shown her photographs of naked men and women on his cell phone while "talking foul language." Id. at 66-67.

Finally, plaintiffs allege, and the Court agrees, that the administrative ruling prepared by an independent investigator commissioned by the Municipality was admissible evidence as an adoptive admission of defendant Municipality.  The ruling concluded that Rodriguez engaged in sexual harassment behavior at work against plaintiff Rosa in contravention of the Municipality's sexual harassment regulations, and further recommended that the Human Resources Director issue a written admonishment to Rodriguez.  (Docket Nos. 154 at 77, 79-80; Docket No. 155 at 84-85; Docket No. 156 at 86.)  Moreover, defendant Municipality applied the ruling to Talavera's claim and determined

that she was a victim to Rodriguez's sexual harassment as well. <u>Id.</u>

The Court finds that the evidence presented at trial could have convinced a reasonable jury to find that the plaintiffs suffered a hostile work environment based on the pervasiveness, frequency, and inappropriateness of Rodriguez's conduct.  The Court is not in a position to make credibility determinations about the plaintiffs' testimony, and while Rodriguez's individual statements and actions may not have risen to the level of creating a cause of action under Title VII, the Court finds that under the "totality of the circumstances" test, the jury could reasonably have found that plaintiffs were subject to a hostile work environment.

### ii.  Employer Liability

The last element necessary in establishing a hostile work environment claim is whether there is a basis for employer liability.  <u>O'Rourke</u>, 235 F.3d at 728.  Defendant Municipality challenges the jury's finding that Rodriguez was the plaintiffs' supervisor, and alternatively, that the Municipality is unable to avail itself of the <u>Faragher-Ellerth</u> defense.  If a supervisor's harassment of an employee results in a "tangible employment action against the employee", the employer is vicariously liable.  <u>Lee-Crespo v. Schering-Plough del Caribe Inc.</u>, 354 F.3d 34, 43 (1st Cir. 2003).  If the harassment does not result in any tangible employment action, the employer is still vicariously liable for a

supervisor's harassment unless the employer can establish a two-prong affirmative defense. Agusty Reyes v. Dept. of Educ. of Puerto Rico, 601 F.3d 45, 53 (1st Cir. 2010). The Faragher-Ellerth defense requires the defendant employer to show, by a preponderance of the evidence, "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Reed v. MBNA Marketing Systems, Inc., 333 F.3d 27, 32 (1st Cir. 2003).

### a.   Supervisor or Coworker Status

Before addressing the substantive merits of defendant's Faragher-Ellerth defense, the Court must determine whether Rodriguez, the alleged harasser, was plaintiffs' co-worker or their supervisor.  The First Circuit Court of Appeals has held that "the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment." Noviello v. City of Boston, 398 F.3d 76, 96 (1st Cir. 2005) (citing Parkins v. Civil Constructors of Illinois, Inc., 163 F.3d 1027, 1034 (7th Cir. 1998).  Morever, the Equal Employment Opportunity Commission ("EEOC") enforcement guidelines dictate that "[a]n individual qualifies as an employee's 'supervisor' if: (a) the individual has authority to undertake or recommend tangible employment decisions affecting the employee; or (b) [t]he individual has authority to

Civil No. 09-1942 (FAB)                                           10

direct the employee's daily work activities." Mack v. Otis
Elevator Co., 326 F.3d 116, 127 (2nd Cir. 2003). (citing the EEOC
Enforcement Guidance on Vicarious Employer Liability for Unlawful
Harassment by Supervisors, 8 FEP Manual (BNA) 405:7654 (1999)).
Plaintiff Talavera testified that Rodriguez was the only person who
assigned her work, evaluated her work and job performance, told her
what to do and what not to do at work, reprimanded her work, and
gave her instructions on how to do her work. (Docket No. 154
at 54.) Plaintiff Rosa testified similarly, stating that Rodriguez
was her supervisor who assigned her work, evaluated her work, gave
her feedback about her job performance, reprimanded her work, and
assigned her work shifts. (Docket No. 155 at 59.) Defendant
Municipality maintained that Rodriguez was not a supervisor, and
that if he was, he was a "low-ranking employee" who doesn't have
the authority to bind the Municipality. (Docket No. 157 at 87-88.)
Because the Court is not in a position to evaluate the credibility
of witnesses' testimonies, it finds that the evidence presented at
trial, particularly the testimony of Talavera and Rosa, was
sufficient to persuade a reasonable juror that Rodriguez was
plaintiffs' supervisor.

### b.   Tangible Employment Action Suffered

The Court next addresses whether plaintiffs
suffered any tangible employment actions. Tangible employment
actions are defined as "'significant changes in employment status,'

including, but not limited to, 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Lee-Crespo, 354 F.3d at 43 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).  Plaintiffs and defendant stipulated before trial that plaintiffs were hired as employees for the "Puerto Rico en Forma" program under contracts "that were periodically renewed depending on availability of funds" and that the program operated until December 31, 2008.  (Docket No. 104 at 47.)  Plaintiffs Talavera and Rosa testified at trial that after they complained of Rodriguez's behavior, he switched plaintiff Rosa's schedule to keep the plaintiffs from "conspiring" against him and assigned them jobs sweeping, mopping and cleaning bathrooms while he threw things at them, laughed at them, and told them that this is what they deserved for "being gossipy" and talking to the deputy mayor about Rodriguez's behavior.  (Docket No. 154 at 67; Docket No. 155 at 68-69).  While the testimony presented at trial may have convinced a reasonable juror that Rodriguez treated plaintiffs unfairly, the behavior described does not necessarily rise to the level of a "tangible employment action" as defined by the First Circuit Court of Appeals.  Thus, absent a tangible employment action suffered by plaintiffs, the Court addresses whether defendant Municipality is entitled to claim the Faragher-Ellerth defense.

### c.   Faragher-Ellerth Defense

In order for defendant Municipality to avail itself of the Faragher-Ellerth defense, it must show both "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Reed v. MBNA Marketing Systems, Inc., 333 F.3d 27, 32 (1st Cir. 2003). The Court analyzes the evidence presented at trial to determine whether defendant Municipality has satisfied its burden of establishing both elements of the defense.

### 1.   Facts Regarding the First Element

To meet the first part of the defense, the Municipality claims that it "had mechanisms in place to help protect employees in preventing any objectionable behavior." (Docket No. 159 at 14.) Plaintiff Talavera testified, however, that she never attended any seminar or received any document regarding her work environment, her rights, or the sexual harassment policy of the Municipality. (Docket No. 74-75.) Plaintiff Talavera signed a document regarding a sexual harassment policy, but she testified that she was never orientated about the policy. (Docket No. 155 at 9.) She also testified that she was asked "to sign the documents all over again" when she renewed her contract with the Municipality. (Docket No. 155 at 32.)

Plaintiff Rosa testified that when she signed her work contract with the Municipality, she also signed "a whole bunch of documents" for which she received no orientation, briefing; nor did she attend any seminar. (Docket No. 155 at 58; Docket No. 156 at 38-39.) Plaintiff Rosa also admitted that she signed a document when she started work which was the Municipality's sexual harassment policy, but denied having read the document. (Docket No. 156 at 7-8.) Rosa testified that when she re-signed the documents in January 2008 to renew her employment contract, she did not make any complaint to Human Resources about Rodriguez's behavior from the prior two months. (Docket No. 156 at 10-12.)

Ms. Zoraida Vera, the Municipality's Human Resources Director at the time the events charged occurred, testified that all employees who are offered jobs are given an "orientation" by an employee in the Human Resources office for matters including the Municipality's sexual harassment policy and the proper procedure to be followed if a person feels harassed. (Docket No. 157 at 8-9.) Vera also testified that the Municipality has in place a sexual harassment policy and that employees are given the policy to sign when they are given an orientation. (Docket No. 157 at 10.) Vera stated that she was not present when either Talavera or Rosa initially received the Municipality's documents and regulations, and thus does not know what, if

anything, was discussed at those meetings.  (Docket No. 157 at 43-
44.)   Municipal  employees  are  not  given  a  copy  of  the  sexual
harassment policy to keep, but are only told that "there are copies
available in each unit of the government of the municipality" and
in Human Resources.  (Docket No. 157 at 44.)

The Municipality's policy states that an
employee's claim regarding sexual harassment must be made "in
writing" to the Human Resources Director.  Id. at 12.  Vera also
testified that according to the sexual harassment policy, the first
step in initiating an investigation is that a complaint must filed
with the Human Resources department, which can be written or
verbal.   (Docket No. 157 at 45.)   Vera testified that no
investigation was initiated after the plaintiffs met with the
deputy mayor in February 2008 to discuss Rodriguez's harassment,
nor were plaintiffs requested to put their complaints about
Rodriguez in writing.  (Docket No. 157 at 47.)

## 2.    Facts Regarding the Second Element

Defendant Municipality also claims that
plaintiffs failed to take advantage of the corrective measures to
ameliorate the harm they may have experienced.

### *February 2008 Meeting*

Plaintiffs  Talavera  and  Rosa  both
testified that they arranged a meeting in February 2008 to speak
with  Luis  Gonzalez  ("deputy  mayor"),  regarding  Rodriguez's

harassment in the work place.  (Docket No. 154 at 63-66; Docket
No. 155 at 11-12, 66-68.)  Plaintiffs testified that at the meeting
they notified the deputy mayor of all the incidents of Rodriguez's
inappropriate behavior (including the incidents of Rodriguez
showing them pornography on his cell phone, asking plaintiffs about
their sexual relations, and making demeaning comments about
plaintiff Rosa's physical appearance), and that the result of such
a meeting was to have a second meeting with all the employees of
the Puerto Rico en Forma program.  (Docket No. 154 at 63-66; Docket
No. 155 at 66-67.)

        Plaintiffs further testified that at the
second meeting they brought forward all of their complaints
regarding Rodriguez's behavior, and "Randy Rodriguez did accept
that he had a behavior that he would need to change."  (Docket
No. 154 at 64; Docket No. 155 at 66-68.)  Plaintiff Rosa testified
that at the meeting, Human Resources Director Vera stated that
because all the employees belonged to the same political party and
that because the mayor was busy with primaries, it was best "to
just let it go."  (Docket No. 155 at 68.) Plaintiff Talavera
testified that the deputy mayor's reaction at the meeting was that
"he wasn't taking serious" the allegations brought against
Rodriguez, "they only accepted Randy [Rodriguez]'s excuse", and
"there was no sort of action or anything." (Docket No. 155 at 16.)

Plaintiff Talavera also testified that she "felt very disenchanted after that meeting" "because actually nothing was done." Id.

The deputy mayor testified that in February 2008, plaintiffs Rosa and Talavera met with him to discuss certain "operational areas of the Puerto Rico en Forma program in which they worked" and the "bad manners" of Rodriguez, but did not mention "anything sexual" in nature during the conversation. (Docket No. 156 at 65-66.)  The deputy mayor also testified that there was a group-wide meeting held shortly after the initial meeting with plaintiffs, at which operational issues of the Puerto Rico en Forma program were again discussed, in addition to "the infantile behavior of Mr. Randy Rodriguez." (Docket No. 156 at 69-70.)  The deputy mayor testified that no sexually charged events were discussed at that group-wide meeting.  (Docket No. 156 at 71-72.)  At the meeting, no "verbal reprimand" was given to Rodriguez but there was an understanding that his "flatulence conduct" would not happen again.  (Docket No. 156 at 72-73.)

Human Resources Director Vera testified about the general meeting that occurred in February 2008, noting that plaintiffs Rosa and Talavera complained of Rodriguez's "vulgar" behavior regarding his flatulence and the picking of his nose, but nothing else.  (Docket No. 157 at 16-18.)  Vera also testified that Rodriguez admitted to his inappropriate conduct and stated that he would improve.  Id. at 20-21.

Jesus Gonzalez ("Gonzalez"), another employee in the Puerto Rico en Forma program, testified that he attended a meeting in the office of the deputy mayor and a large staff meeting in February 2008. (Docket No. 157 at 80-82.) Gonzalez testified that the "bad habits" of Rodriguez were discussed at both those meetings, but that no instances of sexually harassing behavior were brought up. Id. at 81-83. He further testified that Rodriguez was "admonished" during the meetings, and that after the meetings, his behavior did in fact improve. Id. at 82-83.

### Post-February Meeting

Plaintiff Rosa testified that after the February meeting, when the situation with Rodriguez failed to improve, she and plaintiff Talavera wrote a letter requesting a "direct meeting with the mayor", to discuss the "unbearable" situation that had continued with Rodriguez. (Docket No. 155 at 70-71.) Plaintiff Rosa further testified that she and plaintiff Talavera sent a second letter to Human Resources so that it would reach the mayor, in order to inform him of "everything that was going on." Id. Rosa maintained that in response to these two notifications, the Municipality did nothing. Id. Rosa also testified that Talavera and she would inform Vera at Human Resources of the situations in which they "were humiliated and

harassed" by Rodriguez when Vera would call them or they would call her.  Id. at 72.

Rosa testified that after December 2008, when her employment with the Municipality had ended, she drafted a brief letter explaining the harassment she suffered. (Docket No. 156 at 25.)  The letter was submitted to the Municipality in January 2009.  Id. at 26.  Rosa stated in the letter that she had raised the issues before in the February 2008 meeting, and Vera testified that she agreed that "part of" the letter reiterated problematic situations discussed in that meeting. (Docket No. 157 at 52-53.)  Rosa testified that in January 2009, she was approached by Vera for the first time and was asked to provide a written statement of incidents that occurred with Rodriguez so that an investigation could be carried out. (Docket No. 155 at 77-78.)  In February 2009, Rosa attended a meeting with Vera and Rafael Garcia-Ortega, who the Municipality had hired to carry out an investigation about the incidents about which she complained at work.  Id. at 79-82.  Rosa testified that at a later date, she received a letter signed by Garcia-Ortega stating that as a result of the investigation, it was concluded that "defendant Randy Rodriguez-Cardona incurred into sexual harassment actions at work against complainant Esperanza Rosa-Jimenez." (Docket No. 155 at 80-85.)

The deputy mayor testified that after the staff meeting in early 2008, he did not hear complaints from either plaintiff until January 2009, when the program had been terminated. (Docket No. 156 at 73-74.)  When plaintiff Rosa approached him in January 2009 with allegations of sexual harassment by Rodriguez, he immediately called the Human Resources Director and referred the case for an investigation, even though Rosa, Talavera and Rodriguez were no longer employees of the Municipality at that time.  Id. at 74.

Vera stated that the next time she received a complaint from either of the plaintiffs after the general meeting in 2008 was in January 2009, when Rosa approached her with complaints of sexual harassment, after which she asked Rosa to put her complaint in writing and started the investigative process.  (Docket No. 157 at 21-22.)  Vera testified that the first complaint of harassment she received from plaintiff Talavera was in March 2009.  Id. at 26.  Vera did admit, however, that Human Resources received a letter on March 11, 2008 and October 8, 2008, in which plaintiffs Talavera and Rosa requested an urgent meeting with the mayor.  (Docket No. 157 at 35-38.)

### 3.   Legal Analysis of Employer's Defense

The Court acknowledges that a number of conflicting facts were presented during trial, and notes once again that it is not the Court's responsibility to make credibility

determinations about the testimony of witnesses in a motion for
judgment as a matter of law.   While defendant Municipality
presented evidence at trial that it had a sexual harassment policy
in place that was signed by both plaintiffs, the plaintiffs
testified that they were never briefed or oriented about the sexual
harassment policy at all.   Moreover, conflicting testimony was
provided by Vera, the Human Resources Director, regarding the
complaint procedure in the policy, specifically whether verbal
complaints in addition to written complaints could be the basis for
initiating an investigation.

          The Court "need not decide which party
presented the most persuasive testimony", because "it is for
jurors, not judges, to weigh the evidence and determine the
credibility of witnesses." Marrero v. Goya of Puerto Rico, Inc.,
304 F.3d 7, 22 (1st Cir. 2002) (denying employer's motion for
judgment as a matter of law in light of conflicting testimony
regarding the existence of a sexual harassment policy at trial).
Because the jury was at liberty to believe that plaintiffs were not
oriented to the sexual harassment policy before they signed it, and
that plaintiffs' verbal complaints at the February 2008 meetings
could have been sufficient to request a written complaint and
warrant an internal investigation, defendant Municipality has not
satisfied its burden of proving that it is entitled to the first
prong of the Faragher-Ellerth defense.  "In order to qualify for

judgment as a matter of law on its affirmative defense, [the Municipality] had to show that a reasonable jury was compelled to find in its favor on *both* elements of the defense." Marrero, 304 F.3d at 22.   Having concluded that the Municipality failed to satisfy the standard with respect to the first prong of the defense ("the existence of an antiharassment policy with a known complaint procedure"), the Court need not consider the evidence presented at trial regarding the second prong.   See id.

          Nevertheless, the Court briefly notes that as to the second prong of the defense, whether the plaintiffs unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise, the evidence presented at trial is similarly conflicting with respect to when plaintiffs notified Human Resources and the deputy mayor regarding Rodriguez's harassing conduct and when the Municipality was under a duty to investigate the complaints made by plaintiffs.   Plaintiffs testified that at both meetings held in February 2008, they raised the issue of Rodriguez's sexually harassing conduct, and that no formal action was taken against Rodriguez.   The deputy mayor and Vera of Human Resources, on the other hand, both testified that no conversation of Rodriguez's sexually charged behavior was brought to either of them until after plaintiffs' employment with the Municipality had terminated. Because "the party with the burden of proof is entitled to judgment

Civil No. 09-1942 (FAB)                                             22

as a matter of law *only if* it has established its case by
'testimony that the jury is not at liberty to disbelieve'", and the
jury was clearly at liberty to credit the testimony of plaintiffs
over that of the Municipality's witnesses, the Court finds that the
Municipality has failed to satisfy the standard with respect to the
second prong of the <u>Faragher-Ellerth</u> defense.  <u>Marrero</u>, 304 F.3d
at 22 (emphasis added).  Therefore, defendant Municipality's motion
for judgment as a matter of law as to the plaintiffs' Title VII
hostile work environment claim is **DENIED.**

   **C.   Retaliation under Title VII**

         Title VII's anti-retaliation provision forbids
discrimination against employees because they have opposed
practices that are unlawful under Title VII.  42 U.S.C. § 2000e-3.
To prevail on a retaliation claim, plaintiffs must prove three
elements: (1) that "[they] engaged in protected activity; (2) that
[they] suffered some materially adverse action; and (3) that the
adverse action was causally linked to [the] protected activity."
<u>Dixon v. Int'l. Bhd. of Police Officers</u>, 504 F.3d 73, 81 (1st Cir.
2007).  The First Circuit Court of Appeals has explained that a
materially adverse action "must be one that 'could well dissuade a
reasonable worker from making or supporting a charge of
discrimination,' whether or not the harm occurs in the workplace."
<u>Id</u>.  Moreover, "adverse employment actions include 'demotions,
disadvantageous transfers or assignments, refusals to promote,

unwarranted negative job evaluations, and toleration of harassment by other employees." Marrero, 304 F.3d at 23 (citing White v. New Hampshire Dept. of Corrections, 221 F.3d 254, 262 (1st Cir. 2000)).

Plaintiffs maintain that they engaged in protected conduct when they raised concerns about Rodriguez's inappropriate behavior during the February 2008 meetings. Thereafter, plaintiffs state that they continued to experience a hostile work environment at the hands of Rodriguez, and in addition, that plaintiff Rosa's work schedule was changed and plaintiffs were ordered to "unnecessarily clean the bathrooms" of the Sports Coliseum as Rodriguez watched them. (Docket No. 162 at 18.) Plaintiffs' retaliation claims fail for two reasons.

First, the Court finds that plaintiffs' allegations regarding the change in Rosa's schedule and the assignment of more arduous and dirty tasks fall short of establishing that plaintiffs suffered a "materially adverse action" as required for a retaliation claim under Title VII. Plaintiffs failed to proffer evidence that they "suffered any undue hardship as a result" of the schedule change and the assignment of new tasks by Rodriguez. See Morales-Vallellanes v. Potter, 605 F.3d 27, 39 (1st Cir. 2010) (finding that a schedule change that did not cause plaintiff a "materially significant disadvantage" was fatal to plaintiff's retaliation claim); see also Aryain v. Wal-Mart Stores Texas LP, 534 F.3d 473, 485-486 (5th Cir. 2008) (finding that an undesired

transfer to a different department, an undesirable break schedule,
and assignment of more arduous and dirty jobs do not qualify as
materially adverse employment actions in the retaliation context.)
Second, even if plaintiffs satisfied the "materially adverse
action" element of their retaliation claim, they failed to prove
that those actions dissuaded them from making future complaints
about Rodriguez's behavior.  In fact, plaintiffs testified, and
Vera corroborated, that plaintiffs sent two letters to Human
Resources requesting a meeting with the deputy mayor regarding
Rodriguez's offensive behavior in the workplace.  Thus, despite
whatever treatment plaintiffs may have been subjected to after the
February 2008 meetings, they were clearly not dissuaded from making
subsequent complaints about Rodriguez to Human Resources.  See
Jantz v. Emblem Health, No. 10 Civ. 6076, 2012 WL 370297, at *15
(S.D.N.Y. Feb. 6, 2012) (holding that while the test for
retaliation is objective, "it remains relevant whether the
plaintiff [her]self was deterred from complaining.)  In finding
that plaintiffs have failed to establish a Title VII retaliation
claim as a matter of law, defendant's motion for judgment as a
matter of law as to the retaliation claim is **GRANTED.**

## II.  Relief Pursuant to Rule 59

     Defendants argue that pursuant to Federal Rules of Civil
Procedure 59, the Court should grant a remittitur or order a new
trial.  (Docket No. 159 at 28.)  A party requesting remittitur

"bears the heavy burden of establishing that an award is grossly excessive, inordinate, shocking to the conscience of the court or so high that it would be a denial of justice to permit it to stand." Havinga v. Crowley Towing and Transp. Co., 24 F.3d 1480, 1484 (1st Cir. 1994). A reviewing court will not "disturb an award of damages because it is extremely generous or because [the court] think[s] the damages are considerably less." Koster v. Trans World Airlines, Inc., 181 F.3d 24, 34 (1st Cir. 1999). Rather, the court will "adhere to the jury's judgment unless the damages awarded are 'so grossly disproportionate to any injury established by the evidence as to be unconscionable as a matter of law.'" Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 144 (1st Cir. 2009) (quoting Koster, 181 F.3d at 34). The Court considers the parties' arguments regarding compensatory and punitive damages independently.

### A.   Compensatory Damages

On September 30, 2011, the jury awarded plaintiff Talavera $450,000 for compensatory damages sustained as a result of the sexual harassment she suffered, and $150,000 for compensatory damages sustained as a result of the retaliation. Plaintiff Rosa was also awarded $450,000 in compensatory damages as a result of the sexual harassment she suffered, and was awarded $550,000 for compensatory damages as a result of the retaliation. The jury awarded the compensatory damages without apportioning the award

Civil No. 09-1942 (FAB)                                                    26

between the Title VII claims and the Puerto Rico law claims.
Pursuant to this Court's finding that the plaintiffs failed to
establish a viable Title VII retaliation claim as a matter of law,
the Court now holds that both plaintiffs' compensatory damages with
respect to the retaliation claim are reduced to $0.

> **1.    Statutory Cap on Compensatory Damages**

           Defendant alleges that plaintiffs' compensatory
damages are subject to a statutory cap pursuant to Title 42, <u>United
States Code</u>, Section 1981a.  Specifically, 42 U.S.C. § 1981a(b)(3)
sets limits on the amount and types of damages available in certain
actions, including claims of discrimination pursuant to Title VII.
<u>See</u> 42 U.S.C. § 1981a.  Section 1981a(b)(3) states that:

> The sum of the amount of compensatory damages awarded
> under this section for future pecuniary losses, emotional
> pain, suffering, inconvenience, mental anguish, loss of
> enjoyment of life, and other nonpecuniary losses, and the
> amount of punitive damages awarded under this section,
> shall not exceed, for each complaining party - (A) in the
> case of a respondent who has more than 14 or fewer than
> 101 employees in each of 20 or more calendar weeks in the
> current or preceding calendar year, $50,000; (B) in the
> case of a respondent who has more than 100 or fewer than
> 201 employees in each of 20 or more calendar weeks in the
> current or preceding calendar year, $100,000; (C) in the
> case of a respondent who has more than 200 or fewer than
> 501 employees in each of 20 or more calendar weeks in the
> current or preceding calendar year, $200,000; and (D) in
> the case of a respondent who has more than 500 employees
> in each of 20 or more calendar weeks in the current or
> preceding calendar year, $300,000.

42 U.S.C. § 1981a(b)(3).

           Defendant alleges that compensatory damages in this
case must be capped at $300,000 per plaintiff.  Plaintiffs have

Civil No. 09-1942 (FAB)                                                    27

offered no contrary arguments with respect to the application of the statutory cap to the Title VII claims, and the Court finds that plaintiffs' compensatory damages awarded for sexual harassment must be reduced to $300,000 for each plaintiff for their Title VII claims.

        As noted earlier, the jury did not allocate damages between the Title VII claims and the Puerto Rico law claims. Notably, "no similar cap applie[s] to the Commonwealth claims." Rodriguez-Torres v. Caribbean Forms Manufacturer, Inc., 399 F.3d 52, 65 (1st Cir. 2005).   The First Circuit Court of Appeals has held that in cases where the jury has failed to apportion the award between federal and state claims, it is "proper for the district court to allocate the compensatory portion of [plaintiff's] award to the Commonwealth claims so as to preserve as much of the verdict as possible given the Title VII cap." Rodriguez-Torres, 399 F.3d at 66.   Thus, the Court apportions the award as follows:   $1.00 in compensatory damages to the Title VII claim, and the remainder of the compensatory award, $449,999, to the Commonwealth claims, per plaintiff.   Puerto Rico provides a victorious plaintiff with double damages, thus, plaintiffs' award for the Commonwealth damages are doubled to $899,998 for each plaintiff.   Therefore, plaintiff Rosa's total award for compensatory damages is $899,999, and plaintiff Talavera's total award for compensatory damages is $899,999.

The Court has followed the standard calculation for allocating damages in the First Circuit, "to maximize the plaintiffs' recovery while adhering to the Title VII cap." See Rodriguez-Torres, 399 F.3d at 65, 66; Monteagudo v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico, 554 F.3d 164, 174 (1st Cir. 2009). Thus, pursuant to Puerto Rico law, the Court **GRANTS** plaintiffs' motion to amend the judgment and double the amount of compensatory damages awarded. See P.R. Laws Ann. tit. 29, §§ 155j(1); 146(a)(1); 1341(a)(1).

        **2.   Remittitur Analysis**

Defendant also alleges that the award is "grossly excessive" because plaintiffs did not show that they were "disabled – either permanently or temporarily – by their emotional distress," nor did they "introduce any medical evidence to prove the severity of such distress." (Docket No. 159 at 30-31.) Defendant points to the testimony of plaintiff Rosa's treating physician, who testified as to Rosa's emotional distress arising from the adversary proceedings related to this case, not to any sexual harassment she had experienced. (Docket No. 155 at 47-51.) The First Circuit Court of Appeals, however, has held that medical testimony, though helpful, is not required to show emotional harm. Tuli v. Brigham & Women's Hospital, 656 F.3d 33, 45 (1st Cir. 2011). Moreover, the First Circuit Court of Appeals has held that "[t]ranslating legal damage into money damages is a matter 'peculiarly within a jury's

ken,' especially in cases involving intangible, non-economic losses." Smith v. Kmart Corp., 177 F.3d 19, 30 (1st Cir. 1999) (citing Wagenmann v. Adams, 829 F.2d 196, 215 (1st Cir. 1987)).

Plaintiffs Rosa and Talavera both testified about the emotional trauma they suffered as a direct result of the sexual harassment they experienced in their workplace. Plaintiff Talavera testified that the sexual harassment she experienced made her feel "horrendous", "indignant", and "quite disgusted." (Docket Nos. 154 at 55-56, 58, 60, 65.) She further testified that while she was working at the Municipality, she would "go to bed crying and would wake up crying." Id. at 84. She testified that she sought professional help for her panic attacks, she was deeply depressed, and that her family life suffered as a result. Id. at 84-86. Plaintiff Rosa testified that she felt "ashamed", "humiliated", and "demeaned" as a result of the comments made to her by Rodriguez. (Docket No. 155 at 63, 74.) Rosa also testified that while she worked at the Municipality, she was always crying, she was "full of ire and mad about all these things that had happened", she experienced anxiety when she had to go to work, and she sought treatment for her symptoms. (Docket No. 155 at 87-88.)

The Court finds that the testimony of plaintiffs was sufficient to uphold the jury's finding that they were entitled to the amount they awarded for compensatory damages. While the jury award was certainly generous, it was "proportionate to the harm

suffered" by plaintiffs, and it "was neither 'grossly excessive' to 'shock the conscience' of this court, nor was it 'exaggeratedly high.'" Monteagudo v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico, 554 F.3d 164, 174-175 (1st Cir. 2009) (upholding compensatory damage award of $330,000 where plaintiff testified that she "felt 'like a piece of meat' and wept every evening", "suffered from depression and an inability to sleep.") Thus, defendant's request for remittitur as to the compensatory damages sustained as a result of sexual harassment is **DENIED**.

   **B.   Punitive Damages**

        On September 30, 2011, the jury awarded each plaintiff $1,000,000 in punitive damages.  Defendant contends that the evidence presented at trial did not suffice to meet the threshold requirement for awarding punitive damages.  Punitive damages are appropriate in section 1983 suits only "where the defendant acted 'with malice or reckless indifference to . . . federally protected rights.'" Mendez-Matos v. Municipality of Guaynabo, 557 F.3d 36, 48 (1st Cir. 2009) (citing Kolstad v. American Dental Ass'n., 527 U.S. 526, 534 (1999)).  Once a plaintiff has made this showing, she must then establish a basis to impute liability to the employer. Monteagudo v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico, 554 F.3d 164, 176 (1st Cir. 2009).  An employer may avoid punitive liability, even at this stage, "by showing that it engaged in good faith efforts to implement an anti-discrimination

policy." <u>Id.</u> (citing <u>Rodriguez-Torres v. Caribbean Forms Manufacturer, Inc.</u>, 399 F.3d 52, 64 (1st Cir. 2005)).

While defendant is on point with respect to the standard for granting punitive damages, defendant was remiss in failing to articulate the rule regarding the award of punitive damages against a municipality.  As a general and well-established principle of law, punitive damages for claims brought under Title VII cannot be awarded against a municipality. <u>Rodriguez-Sostre v. Municipio de Canovanas</u>, 203 F.Supp.2d 118, 119-120 (D.P.R. 2002) (extending a municipality's immunity from punitive damages "to actions against [municipal] officers when they are sued in their official capacities."); <u>see also</u> <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247, 271 (1981) (finding that "considerations of history and policy do not support exposing a municipality to punitive damages for the bad-faith actions of its officials.").  Thus, because the Municipality cannot be subject to punitive damages as a matter of law, the Court need not assess whether the evidence presented at trial was sufficient to meet the threshold requirement for awarding punitive damages.  Defendant's motion for judgment as a matter of law with respect to punitive damages is **GRANTED**.


**III. Motion for New Trial pursuant to Rule 50 and Rule 59**

Defendant also moves for a new trial pursuant to Rule 50 and Rule 59 as an alternate request to defendant's motion for judgment as a matter of law.  Because the Court has dismissed the retaliation claims, defendant's motion as to the retaliation claim is **MOOT**, but the Court **DENIES** defendant's motion as to the hostile work environment claim.  "[W]hen an argument that the evidence was insufficient forms the basis of a motion for new trial, the district court is generally well within the bounds of its discretion in denying the motion using the same reasoning as in its denial of a motion for judgment as a matter of law."  Lama v. Borras, 16 F.3d 473, 477 (1st Cir. 1994) (describing review of Rule 50 and Rule 59 challenges based on insufficient evidence as "essentially coterminous").  Much like defendant's request for judgment as a matter of law, the request for a new trial asks the Court to invade the province of the jury and make credibility determinations other than those supporting the verdict.  For the reasons expressed above in Section I, the Court declines to do so.  Accordingly, defendant's motion for a new trial for the hostile work environment claim is **DENIED**.

**IV.  Conclusion**

For the foregoing reasons, the Court **DENIES** defendant's motion for judgment as a matter of law for plaintiffs' hostile work environment claim (Docket No. 159); **GRANTS** defendant's motion for judgment as a matter of law for plaintiffs' retaliation claim

(Docket No. 159); **DENIES** defendant's motion for a remittitur;

**GRANTS** defendant's motion for judgment as a matter of law with respect to punitive damages (Docket No. 159); and **DENIES** defendant's motion for a new trial (Docket No. 159). Additionally, plaintiffs' motion to amend judgment pursuant to Puerto Rico law is **GRANTED** (Docket No. 148).

       **IT IS SO ORDERED.**

San Juan, Puerto Rico, August 24, 2012.

                             s/ Francisco A. Besosa
                             FRANCISCO A. BESOSA
                             UNITED STATES DISTRICT JUDGE